Recreational Facility. We have four cases on the calendar this morning. Three patent cases, two from district courts and one from the PTAB and a case from the Armed Services Board of Contract Appeals. First case is Arctic Cat v. Bombardier or maybe Bombardier Bombardier. 2019-10-80. Mr. LoCascio. May it please the court. Craig LoCascio for Arctic Cat. Arctic Cat presents two issues on appeal. Our second argument to recover pre-suit damages based on the actual notice provision of Section 287 would require en banc review to overturn this court's Amstead decision. While I'm happy to address questions the panel may have on that, given its posture, I'm going to focus on the first issue in our brief. But look, regarding the first issue, it's the policy of the law that one must mark product if one is selling it or one doesn't collect damages until notice. Why isn't that sort of the law of the case here? Because your licensee was selling a product and I think part of the history here, if I recall, is that the marking requirement was eliminated from the license, sort of discouraging compliance with the law. And so why shouldn't you be bound by the failure to mark and not collect damages? There's two points on that. First of all, we have to start at what the statute says but let's also look at this court's cases. And to your point, the court's decision in AMS suggests that's not the test because the test is during the period of noncompliance with Section 287 damages absent actual notice are unavailable. The statute itself does not read as a once you make a triggering unmarked sale in perpetuity from there on after, damages are unavailable even if you don't sell. What if I disagree with that? There's a sentence in Section 287A and it's the last sentence. It says in the event of failure to sell mark, no damages shall be recovered by the patentee in any action for infringement except on proof that the infringer was notified of infringement and continued to infringe and so on. So why isn't that language about no damages shall be recovered by the patentee in any action for infringement? Why doesn't that prohibit the argument that you're making here today? First off, I think the failure so to mark has to link back to the beginning of Section 287 which says making, offering, or selling which is written in the present participle. It's happening so during the period of noncompliance and it's not just our view here that that must be the way it's read because under your reading, AMS wouldn't exist because AMS says it can be cured essentially. What if AMS is a judicially created exception that promotes the idea that in that situation where somebody has a product that they haven't marked for six months or a year and then they start marking, you want to continue to promote encouragement of marking. Whereas that policy doesn't seem to exist in your factual circumstances. First off, I'd suggest that I don't think it's a, it certainly wasn't written or described in a manner where it was, we're going to create an exception on a policy basis disregarding the language of the statute. But putting that aside, the policy description from Nike and all the other cases looking at the policy behind 287 even going back as far as Dunlap speak to avoiding innocent infringement. And the statute began as a duty to mark and then evolved into a you can choose to mark. But in all of that context and even in AMS, it says so long as you're putting unmarked products into the marketplace, you are not in compliance and putting unmarked products into the marketplace is the conduct to be in AMS where it sets forth the standard. It says we construe Section 287 to preclude recovery of damages only for infringement for any time prior to compliance with the marking or actual notice requirements. And the marking requirement is if you're making using or offering or selling and you want damages pre-notice, you must mark. And if we step back beyond that to wind railway from the United States Supreme Court and this court in Texas Digital, if you don't make a product, there's nothing to mark and wind railway speaks to the impossibility of that. Do you agree though that AMS' second reason for its holding was to encourage parties that haven't, you know, after the patents issued and they haven't yet complied with the marking statute to encourage them to later comply with the marking statute even if it's a year later, right? That's the policy that was announced in AMS, right? AMS does a simple question. Do you agree that that's the policy or not? I agree that's one of the considerations in AMS. I mean it's an expressly stated policy in that opinion. Correct. How is that policy furthered in your case where what happened was you had a licensee with a license agreement where your client agreed the licensee didn't have to mark. And then two years later with what I think was no action by your client, the licensee stopped making the product. So there's no affirmative act complying with the statute, the marking statute. I'll address that in two points. I don't disagree with the facts of your scenario that you've laid out. But the two points I'll make are one, Section 287 controls here. We're entitled to damages pre-suit unless you make, offer, or sell an unmarked product. And it's written in the sense of are you making, offering, or selling. And the second point I'll make on that is from a policy perspective, if this is a question of what's the policy that ought to be applied, play out the scenario BRP proposes which is if you ever put a product out into commerce that's unmarked and then stop selling. So for instance a university has a series of patents. They take, someone wants to commercialize it. They embark on an effort with them. They don't mark. But then that goes bust shortly thereafter. Under the current posture for that point forward, for the remainder of the term of that patent there's no pre-suit damages for a knowing, willful infringer absent the university figuring it out, tracking them down and giving them actual notice. And I take the policy behind that. I don't understand your hypothetical. Was your hypothetical, and by the way usually we're the ones giving the hypotheticals, but in any event, was your hypothetical that the university didn't mark or did mark initially? It had a licensee who did not mark. Didn't mark. Okay. So that's not different from this scenario. You have a licensee that didn't mark. So it's not a hypothetical. You had a licensee, except for the fact that you're not a university. You had a licensee that didn't mark and then they stopped selling the product. So I don't understand your point. The point is whether it's in this case ArcticCat or any individual inventor or university was my example and I agree the fact pattern isn't different. It's once, if there's an unmarked licensee sale that ceases to occur because they go out of business or it's 10 products or 50 products, at that point the life of the patent under this view is encumbered despite the language of 287. No, we say despite. I think the language of 287 which is what requires it because 287 says in the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement. Why would they say in any action for infringement? I mean, I think that they're saying patentee, once you purposefully cause confusion for the world by allowing a product to be sold that isn't marked but is nonetheless covered by the patent, you have an obligation thereafter to provide notice because you have infused confusion into the marketplace by doing what you've done. So now we're going to hold you. You no longer get the benefit of strict liability for infringement. Now you're going to actually have to provide notice. That's to me clearly what this statute was intended to do. I'm failing to understand how you think the language of the statute helps you. I understand how you think AMS helps you but I don't understand how you think the language of the statute helps you. I think the language of the statute when it's read as failure so to mark is linked back to someone who is making, selling, or offering. So that's how I think the language of the statute helps. It's written not as if you ever made, if you ever sold, you've triggered this. The problem is what if the in any action for infringement doesn't have a temporal limitation? Well, I think if you look at some of the earlier case law on this, the in any action for infringement, there are times where it's a contributory act. There are times where it was a prior owner and so I think you could read it to not be the manner in which Judge Moore read it but taking it down to AMS, if that's the reading then the idea of AMS and other cases that you can somehow cure other than through actual notice finds no support in the statutory language which has to be the touchstone of all of this marking law and we look at the genesis of what even AMS says it's built off the idea of if you're putting unmarked products into the marketplace you're misleading consumers and if you're doing that you can't get damages. Your point is that because AMS has an exception in it in order to promote the policy of encouraging marking that we should further that for a situation where a party also just ceases any selling of product. I don't agree that AMS creates an exception judicially created to the language of the statute. I think AMS is consistent with it on a couple points. The language of it is it looks to compliance with the statute and in the description of when that date would be the date isn't when you start marking under you start selling marked products. AMS repeatedly says full compliance with the marking statute is when you stop shipping unmarked products and when it was no longer distributing unmarked products. So in AMS when it was applied, AMS of course the fact pattern in that case they were selling, but AMS says just selling is not even enough. You have to stop and no longer be selling unmarked products. There are two ways one can fall into compliance at that point. But AMS doesn't say that you fall into compliance by ceasing sales. It doesn't say that. Right? I mean that's a different your facts here are different than the facts in AMS. You must agree. I agree the facts are different because in AMS they continue to sell when they begin to mark. Can I ask you something? Yes. Your hypothetical that you mentioned where you basically mentioned your fact scenario here but mentioned it with respect to a university. Do you think that was more sympathetic of a fact pattern than this case? Because a university might not be looking at what its competitors are doing in the marketplace? No. I don't think it's more sympathetic because we weren't in this marketplace either. Personal Watercraft, Articat had exited that market like Honda ultimately exited that marketplace. The point is if you have no ability to manufacture, that's Wine Railway, which is what Articat never manufactured in this window, any personal watercraft. But it doesn't matter because they licensed Honda to do so. And more over they had a license with Honda that said it's fine you don't have to mark. And during that period. So that was an affirmative action to not comply with the statute. Right? It wasn't an affirmative action not to comply. Honda wasn't required to sell. It wasn't as if Articat was putting out products themselves. But at base to your question, I think if But that doesn't matter because Honda was acting as the agent of Articat for these purposes. And the penalty for that and what Articat would have suffered for that absent the second issue in our brief is the damages window from 2008 or 9 to 2013 is foreclosed because of that effort. So did they make a choice and enter into a license agreement at the time? Yes. And there's a price for that. And we're not saying there shouldn't be. Counsel, you're well into your rebuttal time. You can continue or save it. I'll save the rest. Thank you, Your Honor. Mr. Tompros. Good morning, Your Honor. And may it please the Court, Louis Tompros along with my colleagues Michelle Sandles and Jennifer John on behalf of Bombardier Recreational Products, BRP. I will likewise just address the cessation of sales argument unless the Court would like me to turn to Olmstead. On the cessation of sales, the text of the statute very much is dispositive. The text of the statute describes actions making, offering for sale or selling. And as a consequence of having taken those actions, a party is out of compliance with the statute. That is, a party engages in a failure so to mark. The consequence of that failure is that in any action for infringement, as both Judge Moore and Judge Stoll have identified, and that must mean any subsequent action for infringement. In other words, one doesn't snap back into compliance by ceasing to sell. Correct. That's exactly right. Are you in compliance if you've never sold? I think that the answer is yes. You are in compliance if you've never sold. So if you're in compliance if you've never sold and you don't think you are in compliance by ceasing to sell, what if you start like an American Medical marking? Do you snap back into compliance by marking? The answer is under the statutory text, no. But under this Court's precedent in American Medical, there is a judicially created curative act. I would call it an additional curative act rather than an exception. But I think American Medical very much is policy-driven and very much is creating a judicial additional curative act. And in fact, American Medical says exactly that. It says in light of the permissive wording of the present statute and the policy of encouraging notice by marking, we construe Section 287A to preclude recovery. Yes, but they construe it. They don't say the statute says otherwise but we're creating exception. Like, let me give you an example. In 101, doesn't 101 really cover everything under the sun made by man? I would say probably you could construe it that way, Your Honor. And then there are judicially created exceptions to 101. But those don't have any foundation in the statute. I don't want to take too strong of a position on 101. I will say that 101 does describe certain categories and when you go back to the history of those judicially created exceptions, it certainly cites the statute and those categories and then explains that these categories as construed exclude this. And I think that's very much what American Medical was doing. So I will tell you, I agree with your reading of the statute. It's my reading of the statute. The problem is I'm having trouble reconciling that reading of the statute with the American Medical case because I'm a textualist, right? So I don't favor judicial exceptions. But what's worse, American Medical seems to suggest that they're construing 287, not that they're creating a judicial exception. And so that to me, how do you explain their statement, which you read to us, we construe Section 287A to preclude recovery of damages only for any time prior to compliance. You agree you're complying when you're not selling. If you don't sell, you're complying. Correct. If you don't sell, you are not engaging in a failure so to mark. There is nothing to mark. If you don't sell, you're in compliance with the marking statute. So if you don't sell, you have not engaged in a failure so to mark. That doesn't mean that you are in compliance in a later action for infringement. Once you have failed, once you have taken the action, once the action has happened, once you have failed to mark, there are consequences for that failure to mark. The consequences for that failure to mark are that in any subsequent action for infringement, there must be actual notice. What AMS does is the way that I read AMS, and I agree with you, AMS is tricky from a textualist perspective given the way that they use the word construe. But I will say that what AMS has done is it has read the act of introducing into the market a new product that is marked as an action that is a curative act, just like giving actual notice would be. And that does make policy sense. I agree from a purely textualist perspective. But it doesn't make policy sense. And the reason it doesn't make policy sense, if you flooded the market with hundreds of thousands of unmarked products, and under American Medical, the day you start marking and selling, and maybe you've only sold five products as of that day, you're entitled to damages from that point forward. It takes off the table whether any actual infringer was informed. Maybe many infringers saw the hundreds of thousands of unmarked products and thought that it was fair game to make those products. And the fact that you suddenly mysteriously on day one start making products and marking them and trying to start the process of distributing them doesn't cure the misinformation for any given infringer necessarily. It doesn't necessarily, but it is an action. It is a cure in the sense that if a person wanted to make a product and felt that they could do it freely without fear of a patent, that is if a competitor wanted to make a product, what the marking statute assumes is they're going to go out and look at something and take a look at the product and say, hey, look, I can copy this. It looks really like a great invention and it's totally unmarked. If, under the American Medical line, if they went out and bought the latest version, which you could very well assume they would do as a policy matter, they would say, oh, it is marked. I can't do this. So I agree with you that it is an imperfect scheme, but it's Congress's national policy. To be fair, according to you, the day you're going to launch your product is the day you're going to go and look at the most current product on the market. I mean, if we're talking reality, wouldn't you acquire a product, look it over, then develop your own product, a competing product, which would take some measure of time? That's true. So how would you, I mean, how would you learn about the, quote, cure, that this, oh, wait, now I've put all this time and money into developing a product that I'm about to sell, and I did so because I bought a thousand copies of it that were unmarked, and oh, the day before I launch or the day after I launch. I mean, I agree with you. It's imperfect. It is imperfect, but it is a policy balancing issue that the court was trying to do to create a more fair resolution than a pure absolutely once you have sold your product. Well, the court was trying to do it to incentivize marking, right? That's what they say, because otherwise, if a patentee could never get damages once they failed to mark, they would never bother to mark, because in fact, I guess theoretically, confusion would inert to their benefit, right? More people would invest at that point in the court trying to compete with them, and they would have more people to go after. Absolutely, and that's very much the reasoning of American Medical as it stands, and that's precisely why, and I think that that's why the characterization of American Medical, whether you characterize it as construction, as the case actually did, or whether you characterize it as a judicially created curative act, I think those are reconcilable. The court was attempting to interpret the statute in a broader way than a pure the cold language of the text might otherwise suggest, and as a result, created this incentivized additional cure for marking. What that doesn't do is give a pass to someone who did exactly what Arctic Cat did, which is electively license the product, try to put in the original license agreement a requirement for marking, be told by their licensee we don't want that, and then take it out. They very well could have insisted on including that marking requirement, and they would have probably had to take less money for the license agreement, but that was a choice that they made to be out of compliance with the marking statute. Once they made that choice, the consequence is very clear from the statute, and in fact, there's no dispute that But do you really think, I mean the part that's bothering me, is do you really think once they've made that choice, that if Honda gets out of the market, their licensee, and if Arctic Cat went on the market and sold two of these Ski-Do things, whatever they are, and they marked them both, that that's it, they're suddenly back in compliance now, and from that point forward, they would be able to get damages without any notice? I have to call them personal watercraft, because Ski-Do is a trademark term of our client, but the personal watercraft they would sell, I think the answer is under the logic of American Medical, it's possible, though American Medical does go on and make clear that it is tying this to what it calls substantially consistent and continuous marking. So there is some room there in American Medical. It may be that selling one or two products is not enough. That's a question, I think, for this court for another day. Here we have selling zero products, and we know that zero is not enough. There was no curative act whatsoever. I think I have addressed all of the court's questions on this issue. I'm happy to address the Amstead issue if you would like, or I'm happy just to sit down if the court does not have questions about it. The Amstead issue, the use of the word act in place of fact. The fact is an act. It's either a marking or a notice. You're correct. I would say just the key point on Amstead is let's give them full credit and say that there is indeed a typo in Amstead, either the quotation mark was in the wrong place because an act is a fact or it was a typo with the missing F from an act to a fact. Amstead still perfectly correctly interpreted Dunlap. The very sentence that Amstead quotes and quotes the rest of makes clear, whether it's act or fact, that it is an action to be taken by the patent owner. The sentence is, the sentence in Amstead is each is an affirmative fact, that's the part that they quote, and is something to be done by him. Something to be done by him is the portion in Amstead that makes clear that this is not just about burdens, but is in fact an action to be done, something to be done by him, and him refers back to the prior sentence that's talking about the patent owner. So Amstead got it completely right, notwithstanding the typo, and Amstead is correctly interpreting Dunlap. There's no reason to change that, and there's certainly no reason to go and bank to change that issue. Now, when there was a licensee, and Honda was selling, there was an obligation to mark, and then Honda stopped selling, and there was no longer an obligation to mark, arguably. And if they license someone else, then there's an obligation again, so you have a back and forth inconsistent varying situation with respect to marking requirement, which makes no sense. Well, I think, Your Honor, what the statute is, if you go back to the beginning of the purpose of the statute, the purpose of the statute was very clearly to prohibit false marking and to encourage accurate marking. And when you take that into account, the statutory text requiring marking during a period in which there is making offering for sale or selling, that makes sense. You only have to mark something if you're actually making it or selling it. But once you have failed to do so, the consequences of that failure extend beyond the period in which you're marking it, and they extend to, quote, any act of infringement. Thank you, Counsel. Thank you, Your Honor. Mr. Lucasio has some rebuttal time. Thank you. There is a way to reconcile AMS with the language 287, and it's simple, that cure is when you stop selling unmarked goods because the statute specifically refers back to the making, selling, or offering of products. On the policy side of the House, I certainly does not declare it's creating some policy-based exception. It purports to construe the language. It doesn't actually parse the language because if it did, to find a cure provision that involves marking, there is none. The policy at issue that would apply here, just like it applies in AMS, is to incentivize stopping or cessation of putting unmarked products out into the marketplace. That itself would prevent innocent infringement, which is, at core, the base policy in Nike and going back to the Supreme Court's treatment of Wine Railway. I don't agree because it seems to me once you've put a product covered by the patent on the market with no marking, Mr. Tompereau is exactly right that if somebody was going to compete with that product, they would look at that product. So you stopping to sell it does nothing to cure the misinformation that you've already communicated to the world. Those products certainly are out there. AMS acknowledged that there are products like that that are going to be out there. But there's no analysis in AMS to the point of, I think, tens of thousands of unmarked goods that were in the marketplace. If you don't read 287 to require the current making, selling, or offering of an unmarked product and coming into compliance once that stops, well then you're in a scenario where your example, Judge Moore, if Articat, at the end of the Honda effort, had said okay, this is the way the law is going to be considered, we would have spun up a manufacturing line, sold a handful of personal watercraft that were marked, and then we'd be all set going forward. We don't know if you'd be all set because of the language in American Medical that talks about continuous marking. So that's not really hypothetical. I don't think that our court has resolved that. I think the language of substantially and consistently should be the same standard here of are you substantially and consistently no longer selling unmarked products. That's fine, but your hypothetical was selling five products. I think at that point you would no longer, there's not two are, three aren't. I think at that point there's not a numeric test and once you've stopped, and AMS didn't say how many have you now sold, they said have you stopped selling the unmarked. Thank you. Thank you, counsel. Case is submitted.